Argued and submitted February 26, reversed and remanded April 4, reconsideration denied May 30, petition for review denied August 14, 1990 (310 Or 243)

# JAMES,
*Appellant,*

*v.*

# GENERAL MOTORS OF CANADA, LTD., et al,
*Respondents.*

## (A8604-01955; CA A47843)

790 P2d 8

Robert K. Udziela, Portland, argued the cause for appellant. With him on the briefs were Daniel C. Dziuba and Pozzi, Wilson, Atchison, O'Leary & Conboy, Portland.

Charles F. Adams, Portland, argued the cause for respondents. On the brief were Phillip D. Chadsey and Walter H. Sweek, Portland.

Before Richardson, Presiding Judge, and Newman and Deits, Judges.

## RICHARDSON, P. J.

Plaintiff brought this action against the defendant manufacturer, distributor and sellers of a General Motors van from which she fell while riding as her husband's passenger. She contended that the event occurred because she inadvertently came in contact with the door handle and that, because of the unrecessed design of the handle, the door opened. She alleged that the handle design was dangerously defective. Defendants presented evidence that, the night before the event, plaintiff and a woman friend went out drinking and danced with men other than plaintiff's husband and that plaintiff had disclosed that fact to her husband shortly before the accident. In addition to defending against the defective product allegation, defendants attempted to prove that plaintiff's husband either pushed her from the van or assaulted her and caused her to jump from it. Therefore, they maintained, the design of the handle was not the cause of plaintiff's injuries. The jury found that the van was not "in a defective condition unreasonably dangerous to its users which was a substantial factor in causing injury to the plaintiff." She appeals from the resulting judgment, and we reverse and remand.

There was evidence to support the verdict for defendants on either the theory that the handle was not unreasonably dangerous or the theory that plaintiff's husband, rather than the handle, was the cause of the incident. The strongest evidence that defendants produced in support of the latter theory was the testimony of Leymaster, an emergency medical technician who accompanied plaintiff on the ambulance ride from the accident site to the hospital. He testified that she said to him that her husband "beat the shit out of me, and he pushed me out of the car." On cross-examination, Leymaster testified that he did not include that statement in his report on the incident, did not volunteer it to the police, did not tell plaintiff's investigator about it and did not inform anyone else about it until around the time of trial. However, he was rehabilitated on redirect examination by evidence that he was relatively inexperienced at preparing reports at the time and that the primary function of the report was as an adjunct to the patient's medical treatment rather than to aid investigative efforts.

When asked what he did for a living, Leymaster testified that he was an officer of the Gresham Fire Department. He did not add that he was also employed part-time by defendant Jim Weston Pontiac-GMC, Inc., (Weston) and had been at the time of the accident.[1] Plaintiff discovered that after Leymaster had been excused. During her rebuttal presentation, plaintiff attempted to introduce evidence of Leymaster's relationship with Weston through the testimony of its business manager, Todd, supported by Weston's employment records. The trial court refused to allow her to present that evidence and also refused to permit her to subpoena Leymaster for further testimony. Plaintiff assigns error to the refusal to permit her to introduce Todd's evidence.

Defendants objected to the evidence on the ground that, notwithstanding plaintiff's investigator's having interviewed Leymaster before trial and her attorney's having cross-examined him at trial, no inquiry about his employment status was made and no foundation was laid pursuant to OEC 609-1(1):

> "The credibility of a witness may be attacked by evidence that the witness engaged in conduct or made statements showing bias or interest. However, before this can be done, the statements must be related to the witness and the conduct described, with the circumstances of times, places and persons present, and the witness shall be asked whether the witness made the statements or engaged in such conduct, and, if so, allowed to explain. If the statements are in writing, they shall be shown to the witness."

Plaintiff responds that she could not have discovered the evidence by communicating with Leymaster, because "we know that while in court, under oath, and subject to the laws of perjury, Leymaster felt free to tell a falsehood." Plaintiff's characterization is, to say the best for it, an overstatement. Leymaster did not say anything false about his employment status. Moveover, his nondisclosure of his relationship with Weston may well be explainable by the fact that the subject of his testimony was an incident in which he was involved because of his regular job with the fire department. He could have understood that the purpose of the question about his job

---

[1] Leymaster had also been a full-time employee of Weston approximately four years before these events.

was solely to explain how he happened to be a participant in the events. We do not base our decision on any understanding that Leymaster or defendants engaged in deliberate falsehood or concealment.

Plaintiff also argues that OEC 609-1 does not apply to evidence of bias that is manifested other than through conduct or statements and, therefore, that no foundation was required as a prerequisite to her introduction of evidence about Leymaster's employment relationship with a party. We agree. The court said in *State v. Brown*, 299 Or 143, 699 P2d 1122 (1985):

> "The language of OEC 609-1 may create some uncertainty about the applicability of OEC 609-1 to evidence of bias or interest other than conduct or statements. OEC 609-1 was written by the legislature to codify this court's holding in *State v. Dowell*, 274 Or 547, 547 P2d 619 (1976). In *Dowell*, we held that the typical 'Queen Caroline' foundation of establishing time, place and persons present at the time of prior inconsistent statements should also be required for evidence of conduct or statements demonstrating bias or interest. At the time OEC 609-1 was drafted, OEC 613 required such a foundation. However, in the transition from the Oregon Evidence Revision Commission through the Joint Interim Committee to the final passage, OEC 613's 'Queen Caroline' foundation requirement was dropped. OEC 613 now provides that the prior inconsistent statement of the witness need not be shown or its contents disclosed to the witness at the time of cross-examination nor need the witness be told of the time, place and persons present at the time of the alleged statement. OEC 609-1 is therefore 'out-of-sync' with OEC 613. OEC 609-1 was never intended to restrict other forms of impeachment for bias or interest. Completely aside from OEC 609-1, bias due to friendship, family relationship, etc., and interest in the form of amount of expert witness fees, etc., continue to be viable forms of impeachment even though no conduct or statement is involved." 299 Or at 149-50. (Footnote omitted.)[2]

---

[2] Defendants argue that plaintiff did not make this argument to the trial court. She did. They also assert that any error in the exclusion of Todd's evidence was harmless, because the verdict might have been based on the product defect issue rather than on the causation issue. That possibility does not render any error in the exclusion of the evidence harmless. *See Whinston v. Kaiser Foundation Hospital*, 309 Or 350, 788 P2d 428 (1990); *Port of Portland v. Brady-Hamilton*, 62 Or App 92, 102, 659 P2d 995, *modified* 63 Or App 146, 666 P2d 790 (1983).

■     Todd's testimony and the related documentary evidence were admissible. The closer question is whether their exclusion can be sustained as an exercise of the trial court's control over the proceedings and of its discretion over the admission of rebuttal evidence. Plaintiff had had an opportunity to investigate and cross-examine Leymaster about his employment history and did not avail herself of it. On the other hand, even disregarding plaintiff's suggestions of concealment and perjury, the fact that the on-the-scene emergency medical technician was also an employee of Weston was a coincidence that plaintiff could not anticipate, in the absence of some affirmative indication from Leymaster or defendants. His testimony was devastating to plaintiff and might well have been *the* reason for the verdict. Knowledge of his employment by Weston might well have affected the weight or credibility of his testimony in the jury's eyes. Plaintiff could not reasonably be expected to have learned about the relationship earlier than she did, and she could not have produced Todd's evidence before putting on her rebuttal case. We hold that the evidence should have been received and that its exclusion requires reversal.

■     We turn to plaintiff's other assignments that involve matters likely to arise in the event of retrial. She contends that the court erred by admitting evidence of her husband's prior violent acts, including an encounter with a motorist with whom he had had a near collision and a fist fight with his former job supervisor. OEC 404(3) makes "prior acts" evidence inadmissible "to prove the character of a person in order to show that the person acted in conformity therewith." However, the rule allows such evidence when it is probative of other facts. The rule generally arises in criminal cases, but it is applicable in civil cases as well. *See State v. Johns,* 301 Or 535, 542, 725 P2d 312 (1986). Defendants argue, correctly, that the court in *Johns* characterized the Oregon rule as "inclusionary," *i.e.,* if the evidence is relevant to issues other than character and propensity to act accordingly, it is admissible. In this case, however, the evidence was not relevant to any other issue. The previous violent acts, and the events precipitating them, bore no similarity to the attempted spousal murder that defendants ascribe to the husband or to any of the precipitating events here.

Defendants argue, however, that the prior acts evidence was relevant to *plaintiff's* credibility. They explain:

"[T]he evidence of [the husband's] past violent act[s] is relevant to at least two material issues. First, Sonia James claimed that she did not recall how she exited the van. She also agreed with her husband's implausible claim that they did not argue after she disclosed to him that she had been out drinking and dancing past midnight without having told him those were her plans.

"While Mrs. James also acquiesced in her husband's claim that he never struck her, she was well aware of his capacity for physical combat. Mr. James' acts of violence are relevant to impeach Mrs. James' testimony. Mrs. James' knowledge of her husband's capacity for violence provides a motive (her fear of her husband) for Mrs. James to agree with her husband's testimony in general and in particular to testify that she does not recall how she exited the van."

Defendants rely on our statement in *State v. Jorgensen,* 8 Or App 1, 492 P2d 312 (1971), *rev den* (1972):

"This assignment concerns an incident in the trial when Hobbs, a friend of defendant who was called by the state, proceeded to give testimony at variance with his previous sworn statement taken by the state six months before trial. The prosecutor claimed surprise and sought to impeach by showing among other things that the witness was in fear of defendant and co-defendant Brom. The fact that Brom had previously been convicted of a felony was elicited from Hobbs in the course of this questioning and defendant moved for a mistrial on this account.

"Brom's previous conviction for a felony committed jointly with Hobbs was relevant to the issue of Hobbs' hostility to the prosecution or fear of Brom, and hence had bearing on the witness's motives for changing his testimony." 8 Or App at 10.

*See also State v. Zybach,* 308 Or 96, 775 P2d 318 (1989).

■ The problem with defendants' reliance is that the previous felony in *State v. Jorgensen, supra,* established a direct link between the witness and the defendants, from which the fear or hostility supposedly could be inferred. Here, no comparable inference is possible. Plaintiff and Charles James are wife and husband. His violent encounters with a work supervisor and a motorist, resulting from events that

occurred on the job and on the road, have no tendency to show that he also engaged in domestic violence, except through the "once a thief always a thief" inference that OEC 404(3) makes impermissible. It is a strained inference that plaintiff would fear him because of his history of violence toward relative strangers. The chain of inferences that defendants would draw, beginning with the assaults on the supervisor and the motorist and ending with the proposition that plaintiff lied, is tensile thin: it would not persuade us that this evidence, if offered on remand for the same purpose, would be admissible.

■     Plaintiff also assigns error to the court's exclusion of statistical evidence that she offered during her expert's testimony of General Motors' forecasts of ejections from a 1972 model vehicle that had a similar door handle. The evidence was based primarily on openings and ejections that had occurred during collisions, rather than as a result of inadvertent contacts of the kind alleged here, with no accompanying impact or force. The evidence lacked the requisite similarity to the conditions and circumstances of this case and was correctly excluded.[3] *Davis v. Homasote Company*, 281 Or 383, 387, 574 P2d 1116 (1978).

■     Similarly, the exclusion of the expert's testimony about four opening and ejection incidents that he had investigated or with which he was familiar was a proper exercise of the trial court's discretion. As defendants point out, the information in plaintiff's offer of proof about those incidents, their causes and their similarity to the incident in question was sketchy and speculative, and each incident could have become the subject of a prolonged and confusing diversion of the trial.

Plaintiff also contends that the court erred by allowing two of defendants' witnesses to testify about her credibility. We do not agree that that is what they testified about. The two were experts; they testified concerning the effect of plaintiff's brain injury on her ability to make statements, immediately after the accident, that bore a relationship to reality. The testimony also explored the effect of the injury on

---

[3] The court did allow the expert to tell the jury that the report that contained the statistics recommended that the design of the handle be changed. The recommendation was based, in part, on a review of the file for "accidents that had occurred as a result of the inadvertent door openings."

her memory. Plaintiff presented expert testimony on the same subjects. The evidence was admissible.[4]

The remaining assignments pertain to matters that are unlikely to recur on retrial.

Reversed and remanded.

---

[4] In cross-examining one of defendants' witnesses, plaintiff's counsel asked whether the witness was commenting on plaintiff's credibility and the witness said that he was. Insofar as that exchange resulted in a characterization of the testimony, it was a legal conclusion that is not binding on us. Insofar as plaintiff's counsel may have elicited testimony about his own client's credibility, any error was invited.